Filed 1/12/24  T.G. v. Superior Court CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FIFTH APPELLATE DISTRICT

|  |  |
|---|---|
| T.G.,<br><br>    Petitioner,<br><br>    v.<br><br>THE  SUPERIOR COURT OF MERCED COUNTY,<br><br>    Respondent;<br><br>MERCED COUNTY HUMAN SERVICES AGENCY,<br><br>    Real Party in Interest. | F086994<br><br>(Super. Ct. Nos. 22JP-00027-B, 22JP-00027-C)<br><br><br>**OPINION** |

## THE COURT[*]

ORIGINAL PROCEEDINGS; petition for extraordinary writ.  Donald J. Proietti, Judge.

T.G., in pro. per., for Petitioner.

No appearance for Respondent.

Forrest W. Hansen, County Counsel, and Jennifer Tran, Deputy County Counsel, for Real Party in Interest.

---

[*]    Before Detjen, Acting P. J., Franson, J. and Smith, J.

In this juvenile writ proceeding, Tara G. (mother) seeks extraordinary relief from the juvenile court's order terminating reunification services with respect to two of her young children — Abigail T. (born November 2018) and Penelope R. (born February 2022) (together, the children or the minors)[1] — and setting a permanency planning hearing pursuant to Welfare and Institutions Code section 366.26.[2] Mother argues that the juvenile court erred in terminating her reunification services at the 18-month mark and in failing to return the children to her care under family maintenance because she had been compliant with her reunification plan. We deny the petition.

## STATEMENT OF THE CASE AND FACTS

In February of 2022, the Merced County Human Services Agency (agency) filed a section 300 petition alleging S.G., Abigail and Penelope[3] fell within the provisions of subdivision (b) in that mother and Penelope were positive for methamphetamine at the time of Penelope's birth. It was also alleged that mother had untreated substance abuse and mental health issues, a domestic violence history which exposed her children to domestic violence, and issues relating to supervision of her children. Mother, who stated she was diagnosed with anxiety, depression, and posttraumatic stress disorder was not seeking mental health treatment, but acknowledged she needed help with her addiction. She admitted taking methamphetamine daily since age 13 and used it to induce labor with

---

[1]     At the time Abigail and Penelope were detained, mother's older son S.G. (born December 2008) was also detained. S.G. is not at issue in this writ petition.

[2]     All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

[3]     O.G. and Michael S. were both listed as alleged fathers of S.G.. Mother had been previously married to O.G., but they separated in 2004 and finalized their divorce in 2020; O.G. and Kyle T. were both listed as alleged fathers to Abigail; Jose R. (who was still married to mother) was listed as the alleged father of Penelope. All of the fathers were later determined to be presumed fathers. None of the fathers are parties to this writ petition.

Penelope as she was tired of being pregnant.  A previous dependency case in 2019 involving S.G. and Abigail had similar issues of drug use, an unsanitary home, untreated mental health issues, as well as domestic violence between mother and Kyle T.  Mother later reunified and was given custody of S.G. and Abigail.

*Detention*

At the February 28, 2022, detention hearing, Kyle T. sought to contest the detention of Abigail.   The juvenile court detained S.G. and Penelope, and continued the matter to March 1, 2022, for a contested hearing.

At the contested hearing on March 1, 2022, Kyle T. stated he no longer wished to contest the detention of Abigail, and she was detained.  The jurisdiction/disposition hearing was set for April 6, 2022.

*First and Second Amended Petitions*

On March 17, 2022, the agency filed a first amended petition alleging Kyle T. had failed to protect Abigail from exposure to repeated domestic violence between mother and Kyle T.  Penelope's father, Jose R. was incarcerated at the time of the amended petition.  He had two prior dependency cases involving Penelope's confidential half siblings; his parental rights were terminated in one of the cases and reunification services had been terminated in the other.

A second amended petition was filed March 30, 2022, alleging mother and O.G. had two prior dependency cases involving the minors' confidential half sibling.  In one case, reunification services were terminated and the minor placed in guardianship.  In the other, the parents were bypassed for services.

*Jurisdiction/Disposition Report*

In the agency's report prepared for jurisdiction and disposition, mother acknowledged that the condition of her household was unacceptable, but she believed her children would not touch dangerous items in the house, including a torch "to light a fire at night," a table saw "to cut some wood," and a machete.

3.

Mother acknowledged her 20-year drug addiction, and stated she was sober only when in jail or prison. When asked if her drug use impacted her children, mother stated she did not know because her son "could not tell the difference." She stated she now knew how it impacted him because he was taken from her.

Mother disclosed her various mental health diagnoses, which she self-medicated with marijuana. When she ran out of prescription medication, she did not seek a refill or other mental health services.

Mother claimed her domestic violence issues in two previous relationships were "in the past" and no longer affected her children.

S.G. was interviewed and reported mother smoking marijuana twice, but denied seeing other drugs or drug paraphernalia in the house. He reported that mother always kept a room locked in the house and he did not know what was in that room.

S.G. witnessed violence in the home "sometimes," and reported that mother's friend Bruce would hit him and mother, and Kyle T. would hit both him and mother. S.G. reported that he was afraid of Kyle T., who one time shot at them while they were leaving in the car.

S.G. reported that mother sometimes left him and Abigail with a man named Tommy Horton, a homeless man, but nothing bad ever happened when he cared for them. S.G. acknowledged that there was a machete, table saw, blowtorch adaptor and various other unsafe items in the house, but he knew not to touch them.

Abigail reported that her mother hit her and was mean to her and that "daddy" hurts her.

Mother signed a dependency drug treatment court (DDTC) participant agreement on April 13, 2022.

*Third Amended Petition*

Prior to the jurisdiction/disposition hearing, a third amended petition was filed April 19, 2022, alleging O.G. had failed to protect S.G. from exposure to domestic violence between mother and Kyle T. The agency had been unable to contact O.G.

*Jurisdiction/Disposition Hearing*

At the jurisdiction/disposition hearing April 20, 2022, mother waived her right to a contested hearing on the dual question of jurisdiction and disposition, denied allegations in the jurisdiction/disposition report, and submitted on the agency's recommendation to receive family reunification services.

The juvenile court found the minors came within the provisions of section 300, and mother was offered reunification services. A six-month review hearing was scheduled for October 5, 2022, but eventually continued to October 20, 2022.

*Section 387 Supplemental Petition*

In September of 2022, Abigail and Penelope, who were residing in a relative resource parent's home, were moved to a foster home after allegations that a child in the relative resource parent home hit, pinched and bit Abigail.

*Six-Month Review*

Mother's case plan required her to live free from drug dependency, comply with medical or psychological treatment, develop and use her own specific domestic violence relapse prevention plan, and adequately parent her children.

The six-month review report found mother partially compliant with her case plan. While she was compliant with drug testing, DDTC, and sober living arrangements, the agency found mother lacked the concepts, principles, and skills necessary for recovery. Mother had allowed a friend, Brian Burgess, to move into her home. Mother intended that Burgess would care for S.G. on a full-time basis, although mother and Burgess both had a history of substance abuse and mother knew Burgess was still actively using drugs. There were also numerous times when mother became agitated, irritable, and unstable

5.

with the staff and social workers at the agency, as well as with Abigail and Penelope's care providers.

Mother had been referred for a mental health assessment and claimed to have seen a clinician. However, the agency was unable to verify such services had been provided.

Mother had been referred to individual and group counseling for domestic violence. Mother attended group and individualized counseling but, when confronted with challenging situations, still struggled to refrain from using aggressive behaviors which threatened and intimidated others. At one point, mother followed the care providers, Abigail and Penelope in her car, causing the care providers concern for their safety.

Mother did complete her parenting classes.

At the October 20, 2022, six-month review hearing, mother waived her right to a contested hearing, denied all allegations, and submitted on the agency's recommendation to continue family reunification services. A 12-month review hearing was set for April 6, 2023.

*12-Month Review Hearing*

The agency's 12-month review report was eventually filed May 31, 2023, and recommended continued services for mother. The components of mother's case plan remained unchanged from the six-month review report.

Mother failed to drug test for DDTC on October 27, 2022, and missed a group session on November 3, 2022, and was sanctioned by DDTC. Mother also failed to drug test for the agency on November 17, 2022, but instead tested five days later, which was negative. Tests in February and March of 2023 were also negative.

Mother continued with her mental health services through a program in DDTC and in the "Dual Diagnosis Program," but was advised by the DDTC staff that she needed to work on honesty and accountability.

While mother completed her domestic violence program on March 28, 2023, she was involved in a domestic incident with Penelope's father Jose R. the following day at "their" residence. Mother and Jose R. also engaged in a verbal confrontation on April 13, 2023, this time in front of Penelope.

Mother brought food and activities for the minors when she visited, and her discussions with them were appropriate. But the agency voiced concern regarding the altercation with Jose R., which had taken place in front of Penelope.

The report stated that Abigail had disclosed information amounting to sexual abuse by a man named "Dominic." Mother insisted it was Abigail's caregiver who had perpetrated the abuse, but two subsequent investigations found mother's allegation unfounded. When Kyle T. confronted mother about the abuse, she denied any knowledge of the incident and thereafter did not allow Kyle T. any visits with Abigail. Later, in January 2023, S.G. asked mother who "Dominic" was, and mother claimed not to know. When S.G. told mother he had heard Abigail "call Daniel Dominic before," mother again claimed she did not know who he was talking about.[4]

At the June 22, 2023, review hearing, mother submitted on the agency's recommendation of continued reunification services. An 18-month review hearing was set for August 10, 2023.

*18-Month Review Report*

The 18-month review report filed August 30, 2023, recommended terminating reunification services for mother and setting a section 366.26 permanency planning hearing for Abigail and Penelope. The agency also recommended that S.G. enter accelerated long-term foster care and that a section 366.3 post permanency status review hearing be scheduled for him.

---

**4**    A later report indicates Abigail's sexual abuse occurred prior to detention, likely by a friend of mother's.

The agency found mother in compliance with her case plan objective to live free from drug dependency. She continued to participate in DDTC and tested negative on July 31, 2023. Mother's release of information from her mental health records did not allow her records to be released to the agency, despite the agency's request. She also failed to attend several of her domestic violence prevention classes.

While mother had not missed any scheduled visits with the minors, she failed to prepare for the visits, instead using the resources available in the visitation room or entertaining the minors with her cell phone. She was also observed displaying "some inappropriate parenting throughout some of the visits." And while she was physically and verbally affectionate with the minors, they did not always reciprocate.

A consistent history of concerns by Abigail regarding her visits with mother was chronicled. In June of 2022, Abigail asked mother during a visit if mother was going to hit her. In September of 2022, Abigail disclosed that her mother and mother's friend hit her at the "other house." When Abigail had to be moved to a new placement, she thought she was being returned to mother and said, "Please don't take me away. I don't want to go back." Abigail reported that mother no longer loved her and in September of 2022, stated that mother would "make me dead when I get home." While being transported to a visit with mother, Abigail repeated that mother hit her and again said she did not want to see her.

Abigail woke up from several nightmares in October of 2022, crying and stating she did not want to go back to mother as she was mean and pulled her hair. She repeated her desire not to visit mother in November and December of 2022. In January of 2023, Abigail said that she and mother had a "secret," but that mother would get mad if she said anything. In March of 2023, Abigail reported that visits with mother were going ok because mother did not hit her at visits, only "at home."

Abigail engaged in a number of negative behaviors following visits with mother, including bet wetting and self-inflicted physical harm. She also had night terrors involving contortions of her body, with Abigail screaming "no," and "stop."

Mother requested a contested 18-month review hearing, which was scheduled for October 10, 2023.

*Contested 18-Month Review Hearing*

At the contested 18-month review hearing held October 10, 2023, the agency asked that the juvenile court take judicial notice of the February 2022 detention and March 2022 amended detention reports; the April 2022 jurisdiction/disposition report; as well as the six- and 12-month review reports.

Mother testified in her own behalf and disputed the agency's recommendation to terminate family reunification services, asking instead for a return of the children to her care under family maintenance. Mother believed she had made progress by taking and completing classes; that she was living drug free; and she was testing negative and participating in DDTC, which she was scheduled to graduate from on October 13, 2023.

Mother testified that she regularly attended counseling, saw her therapist twice a month, and took medication as prescribed. She believed she had signed a release of information for the agency. Mother submitted a document from her psychiatrist, indicating that she was attending appointments.

Mother testified that she had completed 14 domestic violence classes and was wait listed for another. When questioned about a March 2023 incident of domestic violence, mother testified that it occurred at Jose R.'s house when the children were not present. According to mother, tensions were high between the two of them after she learned that S.G. was not coming home. She called the police, but wanted to gather her personal belongings before driving away. The arrival of police deescalated the tensions.

When asked about a domestic incident that occurred in April 2023, mother testified that, while visiting her "daughter," she found another woman's number in Jose

9.

R.'s phone and an argument ensued. She now understood a better way to handle the situation would have been to take a deep breath, wait, and approach the situation another time.

Mother claimed she no longer lived with Jose R. and was living with a friend, where she has a room and believed her children could reside with her in that room. Mother testified that she was awaiting admission to a sober living arrangement, and all of her children would be able to reside with her there. She acknowledged that the friend providing mother a room had an open CPS case and did not have her own children in her care.

Mother testified that she never missed her weekly visits with Penelope and bi-weekly visits with Penelope and Abigail, and her monthly visits with S.G. Mother had had two parenting classes — eight sessions in one and 16 sessions in the other. She now believed she had gained insight into how to speak to her children and how to discipline them. Asked about an incident in which Abigail did not give mother a kiss and mother asked Abigail if she did not love her anymore, mother said it was all done in a "jokingly tone," something she claimed she did often.

Mother testified that she did believe Abigail's allegations of sexual abuse. As to why she waited until May 2023 to bring this information to the attention of the agency when she had been told of it by Kyle T. in January, mother stated, "Well, being as that person is so close to me, I didn't really — I couldn't think of who was around my children at that time because I didn't have people coming in and out of the house. It was just that one person who was there helping me while I was pregnant."

Mother claimed never to have been mean or raised her voice, yelled, or hit Abigail, and she did not know why Abigail would refer to her as "mean mommy." Mother insisted that she did not know why Abigail alleged that mother had hit her, told her she was not loved, threatened to kill her or told her she was "dead" when she got

home. While mother knew Abigail had night terrors, she did not know they occurred mostly after visitation.

Counsel for the minors made an offer of proof that S.G. had been interviewed, but the interview had been stopped because he threw things at the interviewer and cursed her. Both Abigail and Penelope called their foster mother "Mommy," and Abigail opposed longer visits with mother because she did not like the visits.

Both counsel for the agency and for the minors argued for termination of family reunification services, as such services had exceeded 18 months. Both argued mother's testimony provided evidence that the return of the children to mother's care would create a substantial risk of detriment to their safety and well-being. In addition, mother was still lacking stable housing, and lacked critical insight into the needs of her children and what brought them into care in the first place. Mother's counsel argued that mother had worked hard in her services.

The juvenile court in its ruling, found that mother had made "all kinds of great progress getting herself in order," but it was concerned about the children. The juvenile court found the children were not doing well, citing S.G.'s serious problems, as well as the comments and behavior of Abigail and her allegations of sexual abuse, "that mother delayed reporting for some period of time," which the juvenile court characterized as "very concerning." The juvenile court found the children were "lagging behind in the relationship" with mother, even though mother had visited consistently. Despite the efforts to reunify, the relationship and connection with mother was not there.

The juvenile court noted that, had mother's lack of housing stability been the only issue, it might have been willing to continue the case until mother got into a sober living facility. "But even with that housing, I would be gravely concerned about the children coming back to Mother's care and Mother being able to provide for them in a way that she would need to provide for them, given what I have heard today about Abigail, what I

11.

have heard about S.G., and what I have heard about some of the domestic violence flare ups that have occurred in the last few months."

The juvenile court was also concerned that mother's work schedule, from midnight to 9:00 a.m., would result in her leaving the young children with a babysitter or someone else. Due to concerns for the safety of the children, the juvenile court found that it could not return the care and custody of the children to mother under a family maintenance plan. After finding a substantial risk of detriment for reasons set forth in the evidence and argument, the juvenile court terminated mother's reunification services and set a section 366.26 hearing for February 1, 2024.

## DISCUSSION

Mother contends the juvenile court erred when it terminated her services and set the section 366.26 hearing because the evidence did not support a finding that an award of custody to mother would be detrimental to the children. Mother's argument is that she fully complied with her service plan, and the juvenile court erred by relying on the children's behavior issues, her current housing situation, and her current employment hours as a basis for the finding of detriment.

We construe mother's writ petition as a challenge to the sufficiency of the evidence to support the juvenile court's findings it would be detrimental to return the children to her custody. Since mother requests additional services (family maintenance services), we also construe the petition as challenging the court's orders terminating her reunification services. We conclude substantial evidence supports its findings and orders.

The 18-month review hearing generally marks the maximum allowable period of reunification services afforded a parent under the dependency statutes. (§ 361.5, subd. (a)(3)(A).) At that hearing, the juvenile court is required to return the dependent child to parental custody unless the court finds by a preponderance of the evidence that the return of the child would create a substantial risk of detriment to the child's safety, protection, or physical or emotional well-being. (§ 366.22, subd. (a)(1).) A parent's failure to

12.

participate regularly and make substantive progress in court-ordered treatment programs is prima facie evidence that return would be detrimental. (*Ibid.*)

If the juvenile court finds it would be detrimental to return the child, it must set a hearing under section 366.26 to select a permanent plan. (§ 366.22, subd. (a)(3).) Section 366.22, subdivision (b), provides exceptions, none of which apply here, that permit the court to continue services. The court must also find the parent is making significant and consistent progress, there is a substantial probability the child will be returned, and that it is in the child's best interest to continue services to the parent. If that is the case, the court may continue services up to 24 months from the date the child was initially removed from parental custody. (§ 366.22, subd. (b).)

Another possible exception that would allow the juvenile court to continue services to continue services beyond the 18-month review hearing is the case where the court finds the parent was not offered or provided reasonable reunification services. (See § 366.22, subd. (a)(3).) However, mother does not claim she was not provided reasonable services.

On a challenge to the sufficiency of the evidence to support the juvenile court's finding, the question is not whether a contrary finding might have been made, but whether substantial evidence supports the finding made by the court. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.) "The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the finding or order." (*Ibid.*) If the finding or order is supported by substantial evidence, it will be upheld. (*Ibid.*)

Here, the juvenile court acknowledged mother had made "great progress" in her services plan, but it was very concerned about the children, stating they were "not doing well." The juvenile court noted S.G.'s behavior issues, and more importantly here, Abigail's allegations of sexual abuse, which mother first denied and only belatedly reported, as well as Abigail's statements about mother hitting her, wanting her dead, and Abigail's statements of mother and the house being "mean." Drawing a distinction

13.

between mother's personal growth and growth as a parent, the juvenile court stated, "Mother can make all kinds of great progress getting herself in order. But the children are lagging behind in the relationship with their mom even though mom has tried to bond with them on a regular basis with visitation. The connection isn't there; it's missing. Something is wrong. Something is not there."

In her petition, mother suggests that the juvenile court could not have found a substantial risk of harm because she had completed her case plan and remedied any risk of future domestic violence or drug use. However, as we have already detailed, there was substantial evidence upon which the juvenile court could conclude mother had not benefitted from the case plan and had not remedied the risk of detriment to the children. "[W]hether to return a dependent child to parental custody is not governed solely by whether the parent has corrected the problem which required court intervention." (*In re Joseph B.* (1996) 42 Cal.App.4th 890, 894; *In re Dustin R.* (1997) 54 Cal.App.4th 1131, 1143 ["[S]imply complying with the reunification plan ... and visiting the children is to be considered by the court; but it is not determinative."].) Thus, even if we were to accept mother's characterization of the record, her successful completion of the reunification plan would, at best, constitute conflicting evidence for the juvenile court's consideration, and reversal is not warranted simply because conflicting evidence in the record might support a conclusion different from that reached by the juvenile court. (*In re Caden C.* (2021) 11 Cal.5th 614, 640.) And even assuming mother had made significant progress toward addressing some of the problems that initially resulted in removal by the time of a permanency review hearing, the juvenile court cannot return a child to parental custody if there continues to be a substantial risk of harm to the child.

Thus, while mother claims it was her lack of housing, her employment hours, and the children's behavior issues that the juvenile court relied on in making its ruling, the juvenile court was clear that it was most concerned with the children and what their behavior and statements said about mother's relationship to them as a parent. On that

14.

evidence, the juvenile court properly found that returning the children to her custody would create a substantial risk of detriment to their physical and emotional well-being. Further, because mother had received 18 months of reunification services and there were no exceptions warranting continued services, the juvenile court had no choice but to set a section 366.26 hearing and mother has not persuaded us otherwise. Consequently, we affirm the juvenile court's orders terminating reunification services and setting a section 366.26 hearing.

## DISPOSITION

The petition for extraordinary writ is denied on the merits. Because the permanency planning hearing in this matter is set for February 1, 2024, this court's opinion is final forthwith as to this court immediately. Mother's request for a stay of the permanency planning hearing is denied as moot.